Juan Francisco CORDERO–
TREJO, Petitioner,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.

No. 94–1385.

United States Court of Appeals,
First Circuit.

Heard Sept. 8, 1994.

Decided Nov. 23, 1994.

484

Maureen O'Sullivan, with whom Harvey Kaplan, Jeremiah Friedman and Kaplan, O'Sullivan & Friedman, Boston, MA, were on brief for petitioner.

Iris Gomez, with whom Massachusetts Law Reform Institute, Boston, MA, was on brief for Guatemaltecos Unidos En Accion of Rhode Island and Massachusetts Immigrant and Refugee Advocacy Coalition, amici curiae.

Donald E. Keener, Office of Immigration Litigation, with whom Frank W. Hunger, Asst. Atty. Gen., and Philemina McNeill Jones, Office of Immigration Litigation, Washington, DC, were on brief for respondent.

Before BOUDIN, Circuit Judge, ALDRICH, Senior Circuit Judge, YOUNG,* District Judge.

BAILEY ALDRICH, Senior Circuit Judge.

Petitioner Juan Francisco Cordero Trejo claims the Board of Immigration Appeals

* Of the District of Massachusetts, sitting by designation.

("Board") erred in dismissing his appeal from a denial of asylum and withholding of deportation by the immigration judge. Cordero's principal contention is that the Board, in summarily adopting the IJ's conclusions, ignored substantial portions of the evidence and accepted inappropriate assumptions about how Guatemalan society operates in concluding that his claim to have a well-founded fear of persecution if returned to Guatemala contains fatal "inconsistencies" and "implausibilities," and that he is statutorily ineligible for either asylum or withholding. *See* 8 U.S.C. §§ 1158(a) and 1253(h) (1988 & Supp. IV 1992).

After full review, we hold that the findings underlying the Board's conclusion that Cordero is ineligible for asylum are not supported by substantial evidence. The Board's adoption of the IJ's findings and conclusions is unreasonable when evaluated in light of the record as a whole. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The Board's initial basis for denying Cordero's bid for asylum, i.e., the IJ's extensive negative credibility findings, are without foundation in the record. The Board's alternative holding that Cordero is statutorily ineligible for asylum based upon, *inter alia,*[1] its conclusion that no one in Guatemala "is interested in him for any of the five statutory grounds for asylum," *In re Cordero,* No. A70438773, slip op. at 2 (BIA Mar. 22, 1994), can only be derived from reliance on those unreasoned findings to discredit a substantial portion of Cordero's evidence. Finally, the Board did not evaluate the record "in light of general conditions" in Guatemala and failed to consider evidence concerning the pattern and practice of persecution of similarly situated persons in Guatemala, as required by INS regulations. 8 C.F.R. § 208.13(a) and (b)(2)(i). *See Osorio v. INS,* 18 F.3d 1017, 1031 (2nd Cir.1994). Accordingly, we vacate the Board's eligibility determination and remand for new proceedings in accordance with this opinion.

---

1. The Board also based this alternative holding on Cordero's failure to show past harm and the fact that his family remains in Guatemala unharmed. These are statutorily insufficient grounds for a denial of asylum, as discussed *infra.*

## I.

### BACKGROUND[2]

Cordero is a native and citizen of Guatemala. He was born in 1948, and completed high school and attended medical school there. He was a 42 year-old married father of four daughters, a small property owner, and owner and operator of a successful construction business that employed dozens of workers when he fled his country in November of 1990. He enjoyed a good standard of living, had savings, and sent his daughters to private school. His wife and daughters remain in Guatemala.

From 1976 to 1990 Cordero also worked as a volunteer with "Laicos Comprometidos" (the committed laymen), a religious organization dedicated to promoting the Catholic faith, to providing medical care, food and clothing to needy Guatemalans and to helping them "rise above their poverty." He travelled on these missions approximately three times a year to remote areas which had been hard hit by conflicts between guerrillas and the Guatemalan military. Cordero testified to having been stopped many times on these missions by armed groups who accused him and his fellow missionaries of inciting rebellion among the rural people.

In 1985 Cordero began to receive anonymous threatening phone calls warning him to stop his activities with Laicos. Then, in 1986, Cordero's younger brother was attacked by armed men who stabbed him multiple times, stating that this was a warning for Cordero. Several months later, Cordero's older brother was attacked by armed men who threw him off a cliff, stating that it was on account of his brother's (Cordero's) failure to heed their warnings. Both brothers survived, and remain in Guatemala. Cordero testified that both before and after these attacks he and members of his family were followed on the street and his house was being watched. He reported the threat-

---

2. Except where expressly indicated, the facts stated herein were not contradicted.

ening phone calls and surveillance, but was unable to obtain any assistance from the National Police.

In November of 1987 Cordero was stopped by the army[3] while on a mission in a region plagued by guerilla unrest. He was interrogated at length about his motives for coming to the region, and when he explained he was with "Laicos Comprometidos" he was accused of inciting rebellion among the people. Several priests with whom Cordero was intimate were killed in the course of their work in the countryside. In 1989 Cordero suspended the activities of a group of lay social workers that he and some friends had founded to help troubled teens because of a telephone threat they received.[4]

In June of 1990, after twelve years of service, Cordero resigned from Laicos because he believed this might put a stop to the campaign against him and his activities that was terrorizing his family. However, in October of 1990 he was accosted on a city street by armed men who identified themselves as belonging to the "death squads." They warned him to abandon the country and that this would be his final warning. They robbed him, but did not harm him physically.

Cordero claims that his family was terrorized and that his own fears of persecution crystallized at this point. He believes that if he returns to Guatemala he will be killed by those who continuously threatened him. He was tempted to leave Guatemala that night, but decided instead to try to leave legally. He obtained a passport without difficulty, but was turned down by the United States Consulate for a visa. He then left Guatemala on November 21, 1990, travelling by bus and on foot through Mexico. He entered the United States near Brownsville, Texas on or about February 2, 1991 without inspection and was apprehended by the Immigration Service shortly thereafter.

In deportation hearings held in March and June of 1991 Cordero conceded deportability and applied for asylum and withholding of deportation, and in the alternative, voluntary departure. Immigration and Nationality Act, §§ 208, 243(h) and 244(e), 8 U.S.C. §§ 1158(a), 1253(h) and 1254(e) (1988 and Supp. IV 1992). The IJ denied Cordero's applications for asylum and withholding, but granted his request for voluntary departure. Cordero appealed to the Board. On March 22, 1994 the Board dismissed the appeal. The Board relied on adverse credibility findings by the IJ in reaching its decision that Cordero did not meet the statutory definition of a "refugee." INA §§ 101 et seq., 101(a)(42)(A), 208(a), as amended, 8 U.S.C. §§ 1101 et seq., 1101(a)(42)(A), 1158(a). The Board reasoned that "inconsistencies and implausibilities" in Cordero's application rendered him unworthy of credibility, and that even if credible, he had failed to establish statutory eligibility for asylum because he had not shown that he was ever harmed in Guatemala, or that his family remaining in Guatemala had been harmed, or that "anyone in Guatemala is interested in him for any of the five statutory grounds for asylum." *In re Cordero,* slip. op. at 2. The Board noted that suffering from civil disturbances and fleeing general conditions of violence do not qualify an applicant for asylum.

Cordero now appeals.

## II.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

■ The INS charges that Cordero did not exhaust his administrative remedies because until now he has claimed only religious persecution, and failed to claim persecution on imputed political opinion and/or social group grounds, as he now seeks to do on

---

**3.** In his affidavit in support of his asylum application, Cordero states that he was "arrested" by the army. Later, in response to questioning before the immigration judge, Cordero stated that he had never been arrested in Guatemala. The IJ in his opinion and the INS in its brief ignore this incident, whereas Cordero's brief maintains he was in fact arrested. Because the record offers no reason to believe the incident described here did not occur, we feel it is safe to assume that Cordero probably understood the word "ar-

rest" as he used it in his affidavit to mean "stop," rather than its more specialized criminal law meaning. We believe the discrepancy can therefore be simply explained by inadequacies of translation.

**4.** This incident too, although not contradicted anywhere in the record, is not acknowledged by either the immigration judge or the INS.

appeal to this court. This contention is without merit. See generally the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status* (Geneva, 1979), ¶¶ 66 and 67. Not only did Cordero check the social group box on his I–589 application for asylum, the immigration judge framed the discussion in his order and opinion principally in terms of the social group ground. Moreover, the language of the Board's decision reveals that it considered Cordero's application lacking with respect to "any one of the five statutory grounds."[5] *In re Cordero,* slip. op. at 2.

### III.

### STANDARD OF REVIEW

■ We review findings of fact and credibility by the Board "under a deferential 'substantial' evidence standard." *Alvarez–Flores v. INS,* 909 F.2d 1, 3 (1st Cir.1990); *Novoa–Umania v. INS,* 896 F.2d 1, 2 (1st Cir.1990) ("we must uphold any finding of fact that is supported by 'substantial evidence'"). Board determinations of statutory eligibility for relief from deportation, whether via asylum or withholding, are conclusive if "supported by reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. § 1105a(a)(4) (1988). *Gebremichael v. INS,* 10 F.3d 28, 31 (1st Cir. 1993).

■ Under normal principles of administrative law governing the role of courts of appeals when reviewing agency decisions for substantial evidence,

> [t]he Board's findings must ... be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both.

*Universal Camera,* 340 U.S. at 490, 71 S.Ct. at 465. This is to ensure that an agency "keeps within reasonable grounds." *Id.* See, *Ghebllawi v. INS,* 28 F.3d 83, 85 (9th Cir.1994) (invoking *Universal Camera* standard to emphasize that Board of Immigration

Appeals is not "a unique kind of administrative agency entitled to extreme deference"). We will not "supplant the agency's findings merely by identifying alternative findings that could be supported by substantial evidence." *Arkansas v. Oklahoma,* — U.S. —, —, 112 S.Ct. 1046, 1060, 117 L.Ed.2d 239 (1992). However, though we defer to reasonable inferences drawn by the Board from conflicting evidence, see, *Martinez v. INS,* 970 F.2d 973, 975 (1st Cir.1992), *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 619–20, 86 S.Ct. 1018, 1026–27, 16 L.Ed.2d 131 (1966), deference is not due where findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record, viewed as a whole, *Universal Camera,* 340 U.S. at 491, 71 S.Ct. at 466; *Radio Officers' Union v. NLRB,* 347 U.S. 17, 49, 74 S.Ct. 323, 340, 98 L.Ed. 455 (1954), or are merely personal views of the immigration judge. See *Damaize–Job v. INS,* 787 F.2d 1332, 1337 (9th Cir.1986). In any case, credibility findings resting on analysis of testimony rather than on demeanor may "deserve less than usual deference." *Consolidation Coal v. NLRB,* 669 F.2d 482, 488 (7th Cir.1982).

### IV.

### DISCUSSION

Of the issues Cordero raises on appeal with respect to the denial of his application for asylum, two merit serious discussion: (1) the Board erred in relying on adverse credibility and other factual findings which are not supported by substantial evidence in the record; and (2) the Board's decision is not supported by substantial evidence because it ignores significant documentary evidence pertinent both to the credibility of Cordero's claimed fear of persecution on account of one or several statutory grounds, and to the persecution of similarly situated persons in Guatemala. We address each argument in turn.

### A. Credibility and Other Factual Findings

The Board's denial of asylum adopted the IJ's findings that Cordero's application and

---

5. Petitioner stated his fear to be "on account of his membership in the social group of religious layworkers (catechists) and on account of the political opinion which is imputed to such peo-

ple, and to the Petitioner in particular." We regard Cordero's application for asylum as justiciable under any one or several of the statutory grounds that the record as a whole supports.

testimony (1) was rife with inconsistencies and implausibilities, and (2) failed to show either that he had suffered past harm in Guatemala, or that his family had been harmed since his departure, or "that anyone in Guatemala is interested in him for any of the five statutory grounds for asylum." *In re Cordero*, slip. op. at 2.

■ As to the Board's second holding, it is well-established that the first two reasons are not prerequisites to qualify for asylum under the statute. INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A), 8 C.F.R. § 208.13(b) and (b)(2)(i). *INS v. Cardoza–Fonseca*, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). *Matter of Mogharrabi*, 19 I & N Dec. 439 (BIA 1987). *See also, Sotelo–Aquije v. Slattery*, 17 F.3d 33, 37 (2nd Cir.1994) (fact that petitioner had not yet been physically harmed "is not determinative of whether he has a well-founded fear of persecution"); *Turcios v. INS*, 821 F.2d 1396, 1402 (9th Cir.1987) (petitioner's "freedom was threatened when he was watched continuously and felt compelled to restrict his activities"). And the third reason is a conclusion that the Board could only have reached by relying on the IJ's adverse credibility findings to discredit the bulk of Cordero's evidence.

■ Because the Board adopted these credibility findings as the initial basis for its denial of asylum, and relied on them in formulating its alternative holding that Cordero had in any event not established statutory eligibility for asylum, the sufficiency of the evidence supporting these findings remains an issue on appeal. We evaluate each IJ finding for substantial evidence:

1. Because Cordero's affidavit does not identify the "unknown armed men" who attacked him and two of his brothers as members of "death squads," nor mentions that the attackers identified themselves as such, the judge found his testimony to that effect inconsistent, and his characterization of these attacks therefore not deserving of credibility.

The record establishes that, far from being "a significant fact that one … would be expected to state in the asylum application or supporting affidavit," as the IJ asserted, accounts of political attacks and killings in Guatemala refer to "unknown attackers," "unidentified men," "armed assailants" and members of "death squads" interchangeably. Cordero's descriptions of his and his family's attackers are thus consistent with how similar incidents are described in Cordero's supporting evidence. The record reveals that precisely because these groups are unofficial and "clandestine" they are by definition "unknown." In fact, the record suggests that in most instances the only way they are knowable, i.e., distinguishable from mere bandits and criminals, is by the threats and indications of motive that typically precede or accompany their violence. Both Cordero's testimony and his affidavit refer repeatedly to the attackers' demands that he discontinue his activities with Laicos, and to warnings of future violence should he disregard them.

Viewing Cordero's affidavit and testimony "in light of the record as a whole," it is difficult to perceive how a reasonable factfinder could find an inconsistency between the labels "death squad" and "unknown armed men" sufficient to impugn the applicant's credibility. Similarly, Cordero's testimony concerning "strongly armed men with vehicles without number plates" is consistent with both labels.

2. "One must question why [Cordero] would report these threats to national police of the Guatemalan government."

■ The record shows that in Guatemala it is, among other things, a *lack* of response by authorities with the power to halt these sorts of attacks that suggests that a particular incident was no ordinary crime or random violence. Viewed in this context, it makes perfect sense that victims would report violent incidents to the authorities. In fact, given that the record contains several examples of victims or relatives reporting such incidents to police, it does not support the assumption that Guatemalans would not attempt to exercise their legal rights in order to prevent, redress or simply record incidents of persecution.

3. Given that Cordero testified that the death squads always carry rifles and use them with impunity, "one must wonder why [neither he nor his] two brothers who were allegedly attacked by death squad members were not shot or apparently attacked with firearms and were not killed."

■ The record documents numerous politically motivated attacks upon social activists and religious lay workers, many, if not most, of which are characterized by acts of violence accompanied by warnings and threats of future violence that do not result in the death of the victim(s). The record suggests that the use of violence as a vehicle for intimidation is widespread in Guatemala. Understood in this context, a reasonable interpretation of Cordero's testimony that the death squads use their weapons with impunity would encompass their use for purposes of intimidation, and not merely for killing.

It is difficult to see how a reasonable factfinder could view Cordero's off-hand comment regarding his attackers' fondness for weaponry in the context of this record, and conclude that his credibility has been compromised. Moreover, to infer that an asylum applicant is unlikely to be persecuted because he and his relatives were not killed during attempts to terrorize them "lead[s] to the absurd result of denying asylum to those who have actually experienced persecution and were fortunate enough to survive ...". *Del Valle v. INS*, 776 F.2d 1407, 1413 (9th Cir.1985).

4. The IJ found it "not particularly credible" that Cordero "would not tell his alleged attackers in October of 1990 that he was no longer a member of or active in the Laicos religious movement if in fact he was threatened ... for his religious activities."

There is perhaps a superficial basis for the IJ's question. How much credit, however, would his attackers give to a protestation that, after so many years, he had resigned or retired? It is to be noted that this confrontation occurred in an urban area, without the attackers waiting to find him in the country-side. Could he reasonably expect to end these threats by talk?

5. The IJ found it "not particularly credible that [Cordero's] attackers, if they were truly interested in his religious activities, would rob him as opposed to physically harming him as they had allegedly threatened to do ....".

■ The record, documenting a wide variety of exploitation, including thefts of documents, robberies, and ransacking of artwork, religious and other valuable property by those seeking to terrorize or intimidate the populace, is to the contrary, and contains no evidence to support this assumption.

6. "One must wonder why the Guatemalan government would place its seal on a document ... extolling [Cordero's] virtues in a movement allegedly targeted by government death squads or would provide information purporting to corroborate the death squad atrocities."

■ Referring to the letter from the Laicos leadership commemorating Cordero's service and resignation, and to certain hospital documents, it appears that the IJ assumed the government puts its stamp of approval on documents executed upon paper bearing government "seals" *after* their completion in concluding that they therefore deserve "little weight." This assumption is not only unsupported by any discernible evidence, but is contradicted by Cordero's testimony that these documents were never submitted to any arm of the Guatemalan government. In fact, examination of the documents belies the IJ's conclusion: paper preprinted with such seals appears to be obtainable from the government merely by payment of fifty "centavos de quetzal" for the purpose of executing "official" documents of any sort, thus the government never sees, let alone approves their contents, as Cordero himself testified.

7. The IJ found that Cordero's supporting documents "are not under oath, are conclusory in nature, provide no foundation for the stated conclusions and ... are suspect at best."

■ An examination of the letters, hospital reports and other documents submitted in

support of Cordero's claim reveals that they were executed on official paper, signed by the affiant, sealed with, e.g., "Laicos Comprometidos," "Hospital General San Juan de Dios" or "Hospital Roosevelt" insignia, and included the language "giving faith to what was previously said" or "CERTIFIES." There is no evidence that this is insufficient to be considered a sworn statement in Guatemala. Both medical statements are signed by hospital officials and the heads of the examining departments; both detail the injuries, and their causes, sustained by Cordero's brothers, as contained in their medical records. The Laicos Comprometidos document is signed by both the President and Secretary of the organization and describes Cordero's work in detail. No reasonable interpretation of these documents supports the immigration judge's conclusions as to their authenticity or worth. *Cf., Dawood–Haio v. INS,* 800 F.2d 90, 96 (6th Cir.1986) (observation that petitioner's sworn statements "are not documented" to conclude he is not telling the truth "is a non-sequitur").

8. The IJ found the fact that Cordero's wife signed her full name on letters to him, and that the letters "are addressed to respondent's formal name" suspect because "one would normally expect the spouse to use the more familiar form."

 The record reveals that Cordero's wife opened her letters to her husband with either "Dear Paco," "My Beloved Husband," or "My dear one," while addressing the *envelopes* to "Senor Juan Francisco Cordero Trejo." It is impossible to see how this is contrary to what "one would normally expect" anywhere. Nor is there any evidence in the record to suggest that signing a letter to a spouse residing in a foreign country by using one's full name is contrary to the common practice of someone of Mrs. Cordero's cultural background.

9. If Cordero "were truly targeted by the government," it is "not particularly plausible" that he obtained a passport.

 This court has acknowledged that ability to obtain a passport does not necessarily indicate absence of persecution. *Ipina*

*v. INS,* 868 F.2d 511, 515 n. 9 (1st Cir.1989). The "mere possession of a valid national passport is no bar to refugee status." United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status,* ¶ 48, at 14 (Geneva 1979); *See, Turcios v. INS,* 821 F.2d 1396, 1402 (9th Cir.1987) (incorrect for IJ to assume government that allows a person to leave will not persecute him upon return). Furthermore, Cordero is not claiming to have been targeted and threatened by the civilian government, but by a shadowy, extralegal entity associated with the Guatemalan military.

10. The IJ assumed that because Cordero never held office in Laicos, and led only two or three missions per year, his involvement in this religious movement was "relatively limited," and that since officers of Laicos "suffered no apparent harm ... for the past several years," Cordero had "embellished" his alleged fear: "Certainly the leading officers ... are more visible and susceptible to potential persecution than are the rank and file members such as respondent."

 The record is replete with references to incidents of politically, socially or religiously motivated persecution of precisely the sort of non-prominent lay or volunteer workers, like Cordero, who carried out the missions for social change to which they or their organizations are committed. The IJ's conclusion about who would have a legitimate fear under these circumstances in Guatemala thus cannot be derived from a reasonable appraisal of the evidence presented in the record.

\* \* \*

Each "inconsistency" or "implausibility" that the IJ identified either appears to be based upon "expectations" without support in the record, or inexplicably refutes uncontroverted testimony, or is flatly contradicted by relevant background and country conditions evidence. It is apparent that the IJ did not consider Cordero's testimony and evidence "in light of general conditions" in Guatemala, as required by law. 8 C.F.R. § 208.13(a).

The IJ never referred to the significant country conditions evidence in the record.

This court, in reversing the Board in *Perez–Alvarez v. INS*, adopted the analysis of a dissenting Board member:

> As a general rule, in considering claims of persecution I think it highly advisable to avoid assumptions regarding the way other societies operate. Time and again this Board has considered appeals in which assumptions of this nature have been proven to be totally wrong....

857 F.2d 23, 24 (1st Cir.1988) (nothing in record sustains IJ's assumptions, "except perhaps his general perception of life or political conditions in El Salvador which may or may not be grounded in fact").

 Here, the IJ's conclusions are not drawn from any perspectives offered by the unique vantage point of the factfinder, such as witness demeanor, conflicting or confused testimony, etc., from which credibility is typically assessed. In fact, it is difficult to ascertain from what sort of evidence the IJ drew his credibility conclusions. The opinion states no more than "one must question why ..." or "one must wonder why...." As the record contains no evidence that supports these findings, we find that they unreasonably eviscerate Cordero's attempt to establish both the objective and the subjective elements of his asylum claim—that he has been, and fears being again, targeted for persecution in Guatemala.

### B. Background and "Country Conditions" Evidence

#### 1. Credibility and Context

 A "well-founded fear of persecution" contains both a subjective and an objective element. *Cardoza–Fonseca*, 480 U.S. at 430–31, 440, 107 S.Ct. at 1212–13, 1217. *Alvarez–Flores v. INS*, 909 F.2d 1, 5 (1st Cir.1990). The former is established via the applicant's credible testimony that his fear is genuine; while the latter is largely dependent upon the context and believability he can establish for his claims through presentation of reli-

able, specific, objective supporting evidence. *Id.* (collecting cases). In addition, the Code of Federal Regulations provides that

> [t]he testimony of the applicant, *if credible in light of general conditions in the applicant's country* of nationality or last habitual residence, may be sufficient to sustain [his] burden of proof without corroboration.

8 C.F.R. § 208.13(a) (emphasis added).

The Board recognizes the importance of documentary evidence both in providing a plausible context for an asylum applicant's claim, and in making credibility assessments:

> Without background information against which to judge the alien's testimony, it may well be difficult to evaluate the credibility of the testimony.... The applicant's statements cannot ... be considered in the abstract, and must be viewed in the context of the relevant background situation. A knowledge of conditions in the applicant's country of origin ... is an important element in assessing the applicant's credibility.

*Matter of Dass*, Int.Dec. 3122, 1989 WL 331876, at *10 (citation omitted). "[T]he general rule regarding the consideration of asylum applications by immigration judges and the Board ... is that they must be evaluated based on matters of record (i.e., based on the evidence introduced by the parties to the case under consideration)." *Id.* at WESTLAW *9.

 Cordero submitted ample documentary evidence confirming persecution of religious, community, and social activists, religious lay workers and members of the clergy.[6] This evidence suggests that all such activists tend to be viewed by the shadowy, quasi-military "death squads" Cordero claims were hounding him and others as responsible for inciting rebellion among poor peasants in the countryside, simply for helping to improve their quality of life. It is thus extremely important for contextualizing, in the absence of direct corroboration, the events which Cordero claims constitute persecution

---

**6.** The Board nowhere suggests that this evidence is unreliable, and we note that it comes from sources, such as the State Department and inter-national recognized non-governmental organizations, generally regarded by courts of law as reliable.

or the threat of persecution on account of activities similar to those of other victims in Guatemala.

Both the judge and the Board failed to address much of Cordero's evidence. With all deference, it is far too extensive and significant to be dismissed with a general statement. This failure unreasonably eviscerates the applicant's attempt to establish the objective element of his asylum claim.

### 2. *Pattern and Practice*

 The "Immigration Judge shall not require the applicant to provide evidence that he would be singled out individually for persecution" if he establishes his inclusion in and identification with "similarly situated" groups of persons against which there is a "pattern or practice" of persecution in his country on account of any of the five statutory grounds for asylum. 8 C.F.R. 208.13(b)(2)(i). Cordero supports his fear of persecution on account of one or several statutory grounds with considerable documentation concerning the treatment of persons in Guatemala engaged in similar activities and motivated by similar religious and social concerns as himself. There are some 150 pages of news items, reports from the State Department, and from international human rights and non-governmental organizations.

Again, the Board makes no mention of this evidence, and no effort to engage in the inquiry necessitated by regulation. *Id.* The record contains upwards of sixty specific incidents of threats, kidnapping, disappearances, murder and other infliction of harm upon the clergy, lay church workers and others connected to church-related activities. It also contains information regarding similar violence against hundreds of others involved in comparable activities.

### V.

### CONCLUSION

Although, for the reasons stated, we believe the present decision denying eligibility cannot stand, we are not sufficiently moved to depart from the usual practice and rule as matter of law. We remand for further consideration by the Board. At the same time,

in all fairness, we apprise the Board that we have grave doubts whether a reasonable fact-finder making the full study this record calls for could deny refugee status to Cordero. The question whether asylum should be granted to Cordero, assuming him to be a statutorily eligible refugee, is a matter for administrative determination.

*Remanded.*