USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

 ____________________

No. 97-1991

 MOHAMMED MEGUENINE,

 Petitioner,

 v.

 IMMIGRATION AND NATURALIZATION SERVICE,

 Respondent.

 
 ____________________

 PETITION FOR REVIEW OF AN ORDER OF

 THE BOARD OF IMMIGRATION APPEALS
 ____________________

 Before

 Boudin, Circuit Judge,

 Aldrich, Senior Circuit Judge,
 
 and Lynch, Circuit Judge.
 ____________________
 
 Robert M. Warren for petitioner.

 Margaret Perry, Office of Immigration Litigation, Civil
Division, United States Department of Justice, with whom Mark C.
Walters, Assistant Director, and Frank W. Hunger, Assistant
Attorney General, Civil Division, were on brief, for respondent. 
 
 ____________________
 
 March 17, 1998
 ____________________
 LYNCH, Circuit Judge. Petitioner Mohammed Meguenine
 seeks reversal of an order of the Board of Immigration Appeals
 (BIA or Board) denying his application for asylum under the
 Immigration and Nationality Act (INA) 208, 8 U.S.C. 1158,
 and his application for withholding of deportation under INA 
 243(h), 8 U.S.C. 1253(h). Meguenine's most substantial claim
 is that the agency improperly required him to produce evidence
 of individualized threats of persecution in violation of 8
 C.F.R. 208.13(b)(2) (1997). Although the BIA failed to refer
 to that regulation in its opinion, its reasoning was consistent
 with the regulation and was otherwise supported by "substantial
 evidence." We affirm.
 I.
 Mohammed Meguenine is a citizen of Algeria who came
 to the United States on July 19, 1993 on a six-month tourist
 visa at a time when violence between Algeria's military
 government and its armed Islamic fundamentalist opponents was
 growing. Meguenine overstayed his visa. On February 9, 1995,
 he applied for asylum under INA 208(a), which gives the
 Attorney General discretion to grant asylum to "refugees," as
 defined by the INA, and for withholding of deportation under
 INA 243(h), which requires the Attorney General to withhold
 deportation to a country in which an alien is "likely" to face
 persecution on account of specified grounds. Following his
 interview with an asylum officer, the Immigration and
 Naturalization Service (INS) brought deportation proceedings
 against him. At a proceeding before an Immigration Judge (IJ),
 Meguenine conceded deportability, and reasserted his
 application for asylum and withholding of deportation.
 The IJ found Meguenine ineligible both for asylum and
 for withholding of deportation, and agreed to grant him
 voluntary departure in lieu of deportation. Meguenine appealed
 the IJ's decision to the BIA. On August 7, 1997, the BIA
 affirmed the IJ's decision. Meguenine's case is governed by
 the "transitional rules" of the Illegal Immigration and
 Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-
 208, Div. C., 110 Stat. 3009-546 (enacted Sept. 30, 1996). 
 That is because the BIA's decision dismissing his case was
 issued after October 31, 1996, but proceedings were brought
 against him prior to April 1, 1997 (IIRIRA's "Title III-A
 effective date"). See IIRIRA 309(c)(1), as amended by Act of
 Oct. 11, 1997, 2, Pub. L. No. 104-302, 110 Stat. 3656, 3657
 (aliens "in proceedings" before April 1, 1997, but whose
 deportation becomes final after October 31, 1996, are governed
 by IIRIRA's "transitional rules"). In general, under those
 "transition rules," aliens appealing a denial of a decision to
 grant asylum under INA 208(a) or to withhold deportation
 under INA 243(h) must file a petition for review within
 thirty days under former INA 106. See IIRIRA 309(c)(4)
 (providing that aliens under the "transition rules" continue to
 be governed by former INA 106, subject to certain exceptions
 which do not apply here). As Meguenine filed the requisite
 petition for review within thirty days, this court has
 jurisdiction.
 II.
 Meguenine's application for asylum must be understood
 in light of the violent conflict between the Algerian
 government and its armed Islamic fundamentalist opponents. In
 1989, Algeria opened its political process to parties other
 than its ruling secular party. An Islamic fundamentalist
 party, the Islamic Salvation Front, soon became the most
 important opposition party. In December 1991, the government
 held elections in two stages. After the Islamic Salvation
 Front won the first stage, the military cancelled the second
 stage. The civilian president resigned and a military junta
 took power. Radical Islamic fundamentalists, who had recently
 formed the Armed Islamic Group, launched terrorist attacks to
 destabilize the new government. The military government's
 forces fought back. Both sides have acted with considerable
 brutality toward the civilian population. So far, tens of
 thousands of Algerians have died in the conflict.
 Meguenine worked for many years as a nurse in a
 government-run hospital in his native city of Oran, Algeria. 
 He testified before the IJ that he is a moderate Muslim, not a
 fundamentalist, that he favors neither side in the present
 conflict, and that he has never been active in politics. He
 nevertheless seeks asylum because, he says, the Islamic
 fundamentalists have targeted health care workers in general,
 and those at his hospital in particular, if they refuse to
 accede to demands that they stop treating government soldiers
 who are injured in the violence. Meguenine says that, as a
 health care professional, he feels ethically obliged to treat
 any injured person regardless of that person's beliefs or
 affiliation in the present conflict, and that he feared
 violence because of a threatening terrorist note at his
 hospital that warned hospital personnel not to treat soldiers. 
 Meguenine notes that, after this note appeared, other health
 care workers at his hospital and elsewhere in the country were
 injured or killed by the terrorists. He contends that this
 evidence suffices to show that he has a "well-founded fear of
 persecution on account of" either his "religion" as a moderate
 Muslim, his "membership in a particular social group" of health
 care professionals, or his "political opinion" of neutrality in
 the conflict. INA 101(a)(42)(A), 8 U.S.C. 1101(a)(42)(A)
 (1994).
 The BIA disagreed. First, it considered the evidence
 Meguenine placed before the IJ in support of his contention
 that neutral health care workers are, in general, subjects of
 systematic persecution by the Islamic fundamentalist groups. 
 Finding this evidence insufficient to show that such
 persecution of neutral health care workers was taking place on
 a systematic basis, it concluded that Meguenine had not shown
 that a nexus existed between his fear of harm at the hands of
 the Islamic fundamentalists and his status as a nurse in a
 government-run hospital. Second, it considered a threatening
 note Meguenine observed personally at his hospital. The Board
 found that this threat was too general and isolated to cause
 Meguenine reasonably to fear that he personally had been
 targeted for persecution on account of his refusal to accede to
 demands that he refuse to treat soldiers fighting the Islamic
 fundamentalists.
 III.
 On a petition for review under old INA 106, this
 court reviews the BIA's decision that Meguenine is ineligible
 for asylum and withholding of deportation to determine of it is
 supported by "substantial evidence." Ipina v. INS, 868 F.2d
 511, 513 (1st Cir. 1989). The court reviews the BIA's legal
 conclusions de novo, although it gives deference, where
 appropriate, to the agency's interpretation of the underlying
 statute in accordance with administrative law principles. SeeAlvarez-Flores v. INS, 909 F.2d 1, 3 (1st Cir. 1990). 
 It is important to note that the BIA did not reject
 Meguenine's application as a matter of law because it regarded
 Meguenine's theory of persecution as legally insufficient to
 establish eligibility for asylum. The BIA's decision took no
 position on whether a health care professional who refuses to
 violate his ethical obligations to treat all injured combatants
 in a violent conflict, and who has a well-founded fear of
 persecution for taking such a stand, qualifies as a "refugee"
 under INA 101(a)(42)(A). Rather, it rejected Meguenine's
 application because it found the evidence that he presented
 insufficient to show that the Islamic fundamentalists were in
 fact systematically targeting neutral health care workers, and
 that the evidence that he individually had faced threats for
 this reason was too scant to support eligibility for asylum.
 Meguenine first argues that the BIA committed legal
 error. He says that the BIA's decision, which relied in part
 on the lack of threats directed at him individually, violated
 a regulation that governs the circumstances in which an
 applicant may be required to produce such evidence. That
 regulation, 8 C.F.R. 208.13(b)(2)(i) (1997), provides:
 In evaluating whether the applicant
 has sustained his burden of proving that
 he has a well-founded fear of persecution,
 the Asylum Officer or Immigration Judge
 shall not require the applicant to provide
 evidence that he would be singled out
 individually for persecution if:
 
 (A) He establishes that there is
 a pattern or practice in his country
 of nationality or last habitual
 residence of persecution of groups of
 persons similarly situated to the
 applicant on account of race,
 religion, nationality, membership in
 a particular social group, or
 political opinion; and
 
 (B) He establishes his own
 inclusion in and identification with
 such group of persons such that his
 fear of persecution upon return is
 reasonable.
 
 Although the BIA did not mention this regulation in its
 opinion, its reasoning is entirely consistent with it and we
 find no violation. The regulation puts the burden on Meguenine
 to "establish that there is a pattern or practice" of
 persecution directed at "persons similiarly situated to the
 applicant" and to establish his inclusion in such a group. The
 BIA's decision first considered whether Meguenine had shown
 that neutral health care workers face systematic persecution
 from the Islamic fundamentalists. Only after it had found
 Meguenine's evidence insufficient to show such a "pattern or
 practice" of persecution did it consider whether the
 threatening note at Meguenine's hospital was sufficiently
 directed at Meguenine to cause him reasonably to fear harm
 because he personally had been targeted for his persistence in
 treating all patients regardless of their political or
 religious beliefs or affiliation in the present conflict. This
 is precisely the procedure that the regulation contemplates.
 As the BIA's decision is not based on an error of
 law, we review these conclusions to determine if they are
 supported by substantial evidence. A reasonable factfinder
 could determine on this record, as did the BIA, that there was
 no pattern or practice targeting neutral health care workers
 and that Meguenine's claimed fears stemmed from the general
 insecurity in Algeria and not from persecution against him on
 one of the statutorily enumerated grounds. See INS v. Elias-
 Zacarias, 502 U.S. 478, 483-84 (1992).
 In support of his claim that health care workers were
 subject to systematic persecution at the hands of the Islamic
 fundamentalists if they refused demands not to treat government
 soldiers, Meguenine proffered the following evidence. First,
 Meguenine testified to the anonymous warning note at his
 hospital. Second, he testified that the newspaper reported
 that a gynecologist at that hospital was murdered by the
 fundamentalists because he treated women. Meguenine also had
 heard that his friend, a nurse, was murdered even though,
 according to Meguenine, "he never speak out (sic)." He had
 also heard that his superior, the director of the hospital, was
 shot and injured by the terrorists and fled to France. Next,
 he proferred testimony by a lawyer who does business in Algeria
 who said that Meguenine's story was plausible and that threats
 such as the note on the wall were to be taken "very seriously"
 and that "virtually anyone" working for a government
 institution in Algeria, such as a hospital, could be a target
 of terrorist violence. Finally, Meguenine submitted human
 rights reports that recount the terrorist assassinations of
 three prominent physicians elsewhere in the country.
 This evidence did not compel the Board to find in
 Meguenine's favor, either on his claim that health care workers
 faced systematic persecution or on his claim that he reasonably
 feared persecution individually. The evidence could be read to
 tend to support the accuracy of Meguenine's contentions, but it
 is not so persuasive that we feel free to reject the BIA's
 conclusions when reviewing the BIA "under a deferential
 substantial evidence standard." Cordero-Trejo v. INS, 40 F.3d
 482, 487 (1st Cir. 1994) (citations and internal quotation
 marks omitted).
 In turn, the BIA's reasons for rejecting Meguenine's
 arguments are rational. The Board noted that, according to the
 human rights reports, the three prominent physicians who were
 assassinated were prominent opponents of the fundamentalists,
 not apolitical health care workers like Meguenine. Indeed,
 those reports contained exhaustive lists of those groups that
 the fundamentalists had singled out for persecution, and
 "health care workers" who choose to remain neutral were not
 among them. Those reports also lend support to the
 government's view that terrorist violence is indiscriminate and
 is not directed at any particular identifiable group of
 civilians other than known supporters of the government. Next,
 the Board observed that Meguenine failed to present competent
 evidence concerning the reason why the physicians at his
 hospital were attacked, thus raising the possibility that they
 were also targeted for their opposition to the fundamentalists
 rather than because of their status as health care workers. 
 The Board also noted that hundreds of nurses worked at the
 hospital who had not been harmed, even though, like Meguenine,
 they had not heeded the threat. Finally, the Board noted that
 Meguenine worked at the hospital for more than a year after the
 threat appeared, undercutting his claim that the threat
 reasonably caused him to fear persecution from the
 fundamentalists.
 This was a valid application of the "well-founded
 fear" standard as set forth in Matter of Mogharrabi, 19 I. & N.
 Dec. 439 (BIA 1987). It is entirely reasonable for people to
 fear harm if they are required to return to Algeria during the
 current conflict, but Congress has not chosen to open the door
 to this country on such a basis. As the government correctly
 notes, it is the law that general fears (even "well-founded"
 ones) of future harm from political upheaval or terrorist
 violence are not sufficient to establish eligibility for asylum
 under 208(a) of the INA. See Novoa-Umania, 896 F.2d at 5. 
 The BIA chose to reject Meguenine's argument that the facts
 establish that an identifiable group of "health care workers"
 face a "pattern or practice" of persecution in Algeria from
 armed Islamic fundamentalist terrorists if they persist in
 treating government soldiers. A careful review of the record
 reveals that substantial evidence permitted the Board's
 conclusion. Likewise, the Board could reject Meguenine's fears
 of specific harm on this record as insufficiently severe and
 particular to support eligibility for asylum or for withholding
 of deportation.
 The order of the Board of Immigration Appeals is
 affirmed.