USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 99-1206

 SANTOS MANUEL BOJORQUES-VILLANUEVA,

 Petitioner,

 v.

 IMMIGRATION AND NATURALIZATION SERVICE,

 Respondent.

 PETITION FOR REVIEW OF AN ORDER 
 OF THE BOARD OF IMMIGRATION APPEALS
 
 
 
 Before
 
 Boudin, Circuit Judge,
 Coffin and Campbell, Senior Circuit Judge.
 
 
 
 
 Maureen O'Sullivan with whom Harvey Kaplan, Jeremiah Friedman,
and Ilana Greenstein were on brief for petitioner.
 Edward J. Duffy, Attorney, Office of Immigration Litigation, 
with whom Christopher C. Fuller, Senior Litigation Counsel, and
David W. Ogden, Acting Assistant Attorney General, Civil Division,
were on brief for respondent.

October 19, 1999

 
 

 COFFIN, Senior Circuit Judge. This is a petition for review
of a final order of deportation under the then applicable section
106(a) of the Immigration and Nationality Act, 8 U.S.C. 1105a(a)
(1995). The specific issue is whether substantial evidence
supports the Board of Immigration Appeals' adverse finding of
credibility, leading it to dismiss petitioner's appeal from an
Immigration Judge's decision denying his request for asylum.
 Petitioner, a 26-year-old citizen of El Salvador, was placed
in deportation proceedings in May 1992, after entering the United
States without inspection. He subsequently filed an application
for asylum, claiming that he and a brother had witnessed the
kidnaping of his uncle and father, the latter being a known
supporter of the government's military establishment, by guerillas
who later killed both men. He feared the same fate if he were to
return to El Salvador. 
 The Board of Immigration Appeals, after reopening an
Immigration Judge's in absentia order of deportation for lack of
clear notice of hearing, and after rejecting the Immigration
Judge's adverse finding of credibility for lack of "specific and
cogent reasons," made its own de novo adverse finding of
credibility. It found discrepancies in the testimony and exhibits
in the record that "are significant and go directly to the heart of
[the] asylum claim." 
 The Board acknowledged that such a kidnaping was consistent
with conditions in El Salvador in January 1992, but added:
 However, what cannot be explained by general country
 conditions is why the respondent alternatively stated
 that he had only witnessed his father's kidnaping, but
 not his uncle's, or that he witnessed both men being
 kidnaped; that after the uniformed men sent him away,
 that he never saw his father again, or that his father
 and his uncle were both paraded past his house; that his
 father had told him where they were going, or that he had
 not told him; and, most importantly, why his mother's
 letter conflicts with any of the versions of the story
 recounted by the respondent.

 After reviewing all of the testimony and documents in the
record, we affirm.
 The petitioner in a case such as this faces a heavy burden. 
To be eligible for asylum, he must establish through credible and
specific evidence in the record that his fear of persecution is
both genuine and objectively reasonable. See Aguilar-Solis v. INS,
168 F.3d 565, 569-73 (lst Cir. 1999). The BIA's determination that
the petitioner has failed to prove his case may be reversed only if 
the record, viewed in its entirety, would compel a contrary
conclusion. See id. at 569. We add that an adverse credibility
determination cannot rest on trivia but must be based on
discrepancies that "`involved the heart of the asylum claim,'" De
Leon-Barrios v. INS, 116 F.3d 391, 393-94 (9th Cir. 1997) (citation
omitted).
 Petitioner criticizes the Board for overlooking "the true
story presented" of the murders -- a child's witnessing his
father's abduction, and a grief- and terror-stricken family -- and,
instead, focusing "its attention on minor, relatively
inconsequential details, . . . violat[ing] its responsibility to
review the record as a whole, with an eye to the cultural,
linguistic, and emotional hurdles unique to asylum applicants."
 To test the substantiality of the inconsistencies, we, like
the Board, consider the description of the underlying basis of
petitioner's fear in (1) his asylum application, dated July 5,
1994; (2) his declaration, filed with the application; (3) a letter
from petitioner's mother to his counsel, dated August 12, 1994
(which, contrary to petitioner's argument, was explicitly made part
of the record), and (4) petitioner's testimony at a hearing on
February 10, 1995. We divide the various statements into three
headings: location of the abduction; details of the abduction; and
subsequent viewing of the victims. We consider the statements in
the order in which they were made.
 Location. In his application, petitioner stated that he and
his brother were working in a field when his father and uncle were
abducted. In his testimony, however, he denied ever having said
that. In the declaration, filed with the application, petitioner
stated that, after working on house repairs, he and his brother
were going to a field to get animals when the abduction took place. 
Petitioner's mother, in her letter, said simply that her husband
was taken from a peace meeting, without anyone noticing. In
petitioner's testimony, some six months later, he said that he and
his brother were going with their father to an unknown destination. 
Indeed, he said that this was the only time they had ever gone with
their father when he did not tell them where they were going.
 Abduction. In petitioner's application, he stated that three
men dressed in what looked like army uniforms abducted both his
father and uncle while he and his brother watched. In his
declaration, filed at the same time, he stated that three men in
green uniforms with helmets took away his father. He did not
mention seeing his uncle. Petitioner's mother, in her letter, made
no mention of the uncle. In his testimony, petitioner said that
two men in uniform took his father. He said he did not see his
uncle. He learned of his uncle's fate only when a son of his uncle
later told him.
 Subsequent viewing. In petitioner's application, he stated
that, some time after the initial abduction, he saw his father and
uncle, their hands tied behind their backs, being taken by his
house. The same observation was reported in his declaration. The
mother's letter made no mention of this viewing. Finally, in his
testimony, petitioner denied having made such a statement and said
that, after the abduction, he never saw his father again. He
stated, however, that his father was taken past his house, without
indicating how he knew this. 
 Petitioner vigorously argues that these various versions were 
merely attempts to clarify, and that in fact they should enhance,
not diminish, his credibility, because they simplified rather than
embellished his case. Perhaps petitioner so intended, but the
problem of inconsistencies remains. His argument that his mother's
peace meeting version of the abduction merely indicates her
superior knowledge of where his father intended to go offers no
explanation why she made no mention of her sons' traumatic report
of the abduction. Similarly, petitioner's argument that his father
had made an early statement about going to pick up animals but that
at the time of the abduction they were going "another way" without
any gear to use with animals cannot be reconciled with his
declaration that at the time of the abduction they were going to a
field to get animals. These are not explanations; they are non
sequiturs. 
 What can we make of all this? We confess our inability at
this juncture to penetrate to the absolute truth of what happened
on that day of alleged abduction in January 1992. It may be
questioned why, in a guerilla-dominated area, guerillas would dress
in government clothing to seize a pro-government sympathizer. It
may also be questioned how a brother of petitioner could continue
to live, apparently safely, in El Salvador. Leaving such queries
aside, we acknowledge that petitioner's basic story could be true. 
 But can we say that the inconsistencies outlined above are at
most marginal, mere gossamer threads? Or that they must all be
attributed to difficulties of language or understanding? Or can we
say, as the dissenting Board member thought, that the Board's
emphasizing the significance of differing versions of a traumatic
event was "unsupported conjecture"? 
 Unlike the cases cited to us by petitioner, such as Canjura-
Flores v. INS, 784 F.2d 885, 889 (9th Cir. 1985), and Damaize-Job
v. INS, 787 F.2d 1332, 1337 (9th Cir. 1986), the inconsistencies
noted by the Board were more than several and more than minor, such
as an error in dates or a typographical error. Petitioner calls
our attention to Cordero-Trejo v. INS, 40 F.3d 482 (lst Cir. 1994),
in which we held that the Board's negative credibility findings
were without record foundation. That case is helpful because it
presents a Board decision that we felt comfortable in setting
aside. Its credibility finding was based on one alleged
inconsistency that we deemed ephemeral (i.e., a supposed
inconsistency between calling attackers "unknown armed men" and
"death squads, id. at 488); a hypertechnical challenge to the
authenticity of documents; and eight "implausibilit[ies]," id. at
490.
 Here, in contrast, the multiple inconsistencies went to the
central facts of the triggering event. The discrepancies concerned
the where, the who, the when and the what of the abduction. And
the only alleged "implausibility" is the Board's observation that
if petitioner had in fact been present at such a traumatic event as
a kidnaping of his father, he would not likely have overlooked the
major details of that event. But this is the very stuff of
legitimate impeachment.
 Moreover, not only were there multiple differences, but they
were not greatly separated in time. The application and
declaration, prepared with the assistance of counsel, were dated
the same day; the mother's letter came a month later; and the
testimony followed six months later. Petitioner stated that all
written statements had been read to him. There was no attempt,
although there was ample time, to elaborate upon or explain the
mother's varying interpretation. 
 In short, we know of no principled basis for reversing the
Board's decision short of saying that an appellate court can
conduct de novo review of every non-frivolous case involving non-
English speaking parties. This we cannot do. The Board's finding
of adverse credibility was supported by substantial evidence, which
it succinctly summarized. Its decision to allow timely voluntary
departure, or, failing that, to order deportation must be 
 Affirmed.