USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit
 
 ____________________
 
 
 
 No. 97-2283
 
 IRMANTAS GAILIUS,
 
 Petitioner,
 
 v.
 
 IMMIGRATION AND NATURALIZATION SERVICE,
 
 Respondent.
 ____________________
 
 ON PETITION FOR REVIEW OF AN ORDER OF
 THE BOARD OF IMMIGRATION APPEALS
 ____________________
 Before
 Stahl, Circuit Judge,
 Cyr, Senior Circuit Judge,
 and Lynch, Circuit Judge.
 ____________________
 
 Harvey Kaplan, with whom Maureen O'Sullivan, Jeremiah
 Friedman, Kaplan, O'Sullivan & Friedman, LLP, Herbert Epsteinand International Institute of Boston were on brief, for
 petitioner.
 
 Timothy P. McIlmail, with whom Frank W. Hunger,
 Assistant Attorney General, Civil Division, Norah Ascoli
 Schwarz, Senior Litigation Counsel, and Francesco Isgro, Senior
 Litigation Counsel, Office of Immigration Litigation, Civil
 Division, United States Department of Justice, were on brief,
 for respondent.
 ____________________
 
 June 23, 1998
 ____________________
 LYNCH, Circuit Judge. Irmantas Gailius petitions for
 relief from the denial of his claims for asylum and withholding
 of deportation. Gailius fled his native Lithuania in 1990,
 when that country was part of the Soviet Union, because he
 feared the Soviet authorities would persecute him for his
 activities in support of democracy and Lithuanian independence. 
 Lithuania became independent and has held two elections that
 international observers have certified as free and fair. 
 Largely on the basis of these dramatic changed country
 conditions, as confirmed in State Department opinion letters,
 the Immigration Judge (IJ) denied Gailius' claims, and the
 Board of Immigration Appeals (BIA) affirmed.
 Gailius, however, put evidence in the record to show
 that the former Communist Party has been restored to power in
 Lithuania through electoral means, that some former Communists
 have engaged in violent reprisals against those who took part
 in Lithuania's democracy movement, and that numerous specific
 threats have been directed against him. Gailius submitted into
 evidence threatening letters, which he said were sent to his
 family, warning that he would be murdered if he returned to
 Lithuania. He also provided expert testimony casting doubt on
 the State Department's positive view of the current regime in
 Lithuania.
 It is well established that general changes in
 country conditions do not render an applicant ineligible for
 asylum when, despite those general changes, there is a specific
 danger to the applicant. See, e.g., Fergiste v. INS, 138 F.3d
 14, 19 (1st Cir. 1998). Therefore, the authenticity of
 Gailius' physical evidence and the credibility of the account
 of threats against him is a central issue in his case. But the
 IJ did not make findings concerning the truthfulness of
 Gailius' testimony about these threats or the authenticity of
 the threatening letters, and did not offer any adequate
 explanation for why these threats, if they had occurred, would
 not cause a reasonable person to fear persecution.
 In the absence of such findings, coherent review of
 the agency decision, which we are required by statute to
 perform, is impossible. Accordingly, we vacate the BIA's order
 and remand the case for further proceedings consistent with
 this opinion.
 I. We summarize the evidence that Gailius presented to
 the agency, and then describe the agency's assessment of that
 evidence.
 Irmantas Gailius was born in 1971 in what was then
 the Soviet Socialist Republic of Lithuania, U.S.S.R. In 1987,
 Gailius entered Vilnius Civil Engineering Institute, the
 university where his father Albinas taught. Gailius soon
 became active in a variety of political activities opposing the
 Soviet regime. In the spring of 1988, Gailius helped to
 organize a student chapter of the Lithuanian Freedom League,
 then an underground movement, and served as an officer. He
 wrote and signed political articles for outlawed newspapers
 urging democracy and independence and organized political
 rallies and demonstrations. In October 1988, Gailius served in
 a security detail guarding a meeting of the Sajudis Congress,
 the organization that eventually secured Lithuania's
 independence and whose leader oversaw the adoption of
 Lithuania's current democratic constitution. Gailius submitted
 into the administrative record a photo identification card
 noting his status as a student security guard for Sajudis.
 Gailius was also a member of the Lithuanian National
 Youth Union "Young Lithuania", which encouraged Lithuanian
 youth to resist the Soviet draft as a protest against the
 Soviet military's presence in Lithuania. Gailius publicly
 refused to cooperate with the draft and demanded that the
 Soviet army leave Lithuania. In November 1989, he lay in front
 of oncoming tanks with other "Young Lithuania" activists in a
 Red Army parade, was arrested, and spent a twenty-four hour
 period under intense KGB interrogation. During that
 interrogation, the KGB threatened to have him expelled from the
 university (thus subjecting him to the draft) and to have his
 father Albinas Gailius fired.
 In February 1990, Irmantas Gailius signed a letter,
 put into evidence, refusing conscription into the Soviet
 military. He sent the letter and his military passport to
 Soviet authorities. That same month, Gailius helped organize
 and spoke at a demonstration protesting the visit of a Soviet
 minister to the university. Gailius and other students posted
 placards -- demanding independence and the withdrawal of the
 Red Army from Lithuania -- at the hall in which the minister
 was speaking. The placards were removed. Gailius attempted to
 give a note to the minister containing the students' demands,
 which university faculty intercepted.
 In March 1990, the first free elections since World
 War II were held in Lithuania. The Sajudis movement, headed by
 Vytautas Landsbergis, won the elections, and the Lithuanian
 Parliament voted in favor of independence. The Soviet Union
 responded by surrounding the Lithuanian Parliament Building
 with tanks and by imposing an economic embargo on Lithuania. 
 Gailius helped build barricades around the Lithuanian
 Parliament Building to protect the legislators from Soviet
 troops. In May 1990, Gailius joined the outlawed volunteer
 army formed by Sajudis.
 Because of his role in the February 1990 protest, the
 university faculty voted to expel Gailius at the end of the
 academic year in June. That order expelling him and other
 students "because of their participation in antigovernment
 demonstration[s] and [for] using slanderous slogans against the
 [Soviet] Deputies" was put into evidence. Having lost his
 status as a student, Gailius became subject to the draft. 
 Gailius feared that he would be drafted into the
 Soviet army and placed into a special "punishment unit" for
 political dissidents, where he would be brutalized. He decided
 to leave Lithuania for a time. He spent the next few months in
 Poland, Czechoslovakia, East Germany and West Germany, until he
 could travel to the United States. In October 1990, he
 received a draft notice from the Soviet authorities. Gailius
 obtained a visitor's visa and purchased a round-trip ticket to
 Washington, D.C., for a flight in November, intending to stay
 with relatives.
 In January 1991, Soviet authorities attempted to
 overthrow the elected government of Lithuania, and Soviet armed
 forces attempted to take control of the central television
 tower in Vilnius, killing several civilians. The attempt
 failed. The Soviet Union continued the economic embargo and
 refused to accept Lithuania's independence. Gailius, in this
 country, applied for asylum.
 In July 1991, while Gailius was awaiting his asylum
 interview, he spoke with his family in Lithuania and learned
 that his sister Ingrida, a public school teacher, had been
 taken into KGB custody for four hours and interrogated
 concerning Gailius' whereabouts. The KGB officials told
 Ingrida that if Gailius did not return soon, and face induction
 into the military, his family would never see him again.
 In August 1991, the Soviet Union's disintegration
 accelerated with the failure of a coup attempt in Moscow
 against President Gorbachev. The Soviet Union recognized
 Lithuania's independence and ended its economic embargo. At
 the end of the year, the Soviet Union itself passed into
 history.
 After Lithuania became independent, there was,
 however, considerable evidence that threats personal to Gailius
 occurred. That evidence was of a variety of threats against
 Gailius and his family after December 1991. Gailius learned of
 these threats from telephone conversations with his father and
 from documents (including the threatening letters) that his
 father mailed to him (either from outside Lithuania or hand-
 delivered to him through friends sympathetic to the Lithuanian
 democracy movement). It is primarily this evidence which forms
 the basis of Gailius' claim that, despite the dramatic overall
 changes in Lithuania, there is still a specific threat of
 persecution against him.
 After Lithuanian independence, on the night of March
 12, 1992, while Gailius' parents were sleeping, a flaming
 Molotov cocktail was thrown into their bedroom and another into
 their living room. Gailius' parents called the police. After
 the police learned whose apartment it was, they advised
 Gailius' parents not to call the fire department. The next
 morning, the police arrived in civilian clothes and warned
 Gailius' parents not to mention the incident to anyone.
 On April 7, 1992, Gailius' sister Ingrida was fired
 from her job as a public school teacher. The director of the
 school told her that she was being fired because she had a
 troublemaking brother in the United States who had demonstrated
 against the government in Lithuania, and that she could look to
 him for financial support.
 On June 21, 1992, the local public prosecutor
 interrogated Gailius' father Albinas concerning Gailius'
 whereabouts and when Gailius intended to return to Lithuania. 
 The prosecutor threatened Albinas that his life would become
 very difficult if he did not cooperate and help the authorities
 by persuading his son to return. On July 13, 1992, Albinas was
 fired from his post as a university professor. The reason
 given in the firing notice was that he had "improperly" raised
 his son. A copy of that notice was placed into the record.
 On July 21, 1992, the Gailius family received the
 first of at least nineteen threatening letters directed against
 Irmantas Gailius. These were sent to his family over a two-
 year period. Each was eventually sent to Gailius and placed
 into evidence. The first letter was addressed to "Irmantas"
 and stated, "Just as our grandparents fought in 1940 for the
 establishment of the Soviet system in Lithuania, so we are now
 determined to catch people like you. There were victims then
 and there will be now." The letter was signed "Komsomol." The
 Komsomol is the Communist Party youth organization. Gailius
 had fought with members of that organization in his days at the
 university. The next day, three well-dressed men came to the
 Gailius family apartment and demanded to see Irmantas Gailius. 
 Gailius' mother sent them away, saying she did not know where
 he was.
 On August 1, 1992, the Gailius family received
 another threatening letter demanding that Gailius "come forward
 show up [sic] and answer for your slander against the Soviet
 government and its officials." The letter was signed
 "Initiative group for the re-establishment of the Soviet
 regime." Id. The same three men who had appeared in July
 arrived again at the Gailius apartment on August 6, 1992, again
 demanding to know where Irmantas Gailius was, and were again
 sent away.
 On August 26, 1992, while Gailius' parents were out,
 the apartment was vandalized and a fire was set; Gailius'
 parents were able to extinguish the fire. On the front door,
 one of the perpetrators wrote, "We came looking for Irmantas." 
 Irmantas Gailius' father Albinas decided not to call the
 police, believing the vandals were in complicity with the
 authorities. On September 6, 1992, Gailius learned from his
 father that his friend and colleague in the movement for
 Lithuania's independence, Robertas Gunevicius, had been
 murdered. Painted on his body were the words: "You shall not
 overcome." After the murder, Albinas Gailius received an
 anonymous letter composed of letters cut from a newspaper,
 stating "ROBERTAS GUNEVICIUS - 1 / IRMANTAS GAILIUS - NEXT."
 In October 1992, elections were held in Lithuania
 and, to the surprise of many observers, the former Communists
 won. That election was Lithuania's first as an independent
 nation. After the victory of the former Communists, the
 threats against Gailius and the harassment of his family
 continued and intensified. A letter sent to the Gailius family
 dated November 27, 1992, one month after the former Communists
 were reelected, states "IRAMANTAS . . . YOU WILL BE DESTROYED
 . . . YOUR TIME (1989-1990) IS GONE." Another states,
 "IRMANTAS GAILIUS, TO ALL . . . YOUNG LITHUANIANS [i.e.,
 members of the pro-independence group] INCLUDING YOU -- THE
 END!" Another states, "IRMANTAS, SAVE YOUR HIDE SOONER OR
 LATER . . . THE RULE OF OUR ORGANIZATION -- DESTROY PHYSICALLYTHOSE WHO GO AGAINST OUR IDEOLOGY!"
 This is a small sample; there are many similar
 threatening letters in the record. Many are signed "Lithuanian
 Youth Forum," which is the successor organization to the
 Komsomol or Lenin Young Communist League. This frightened
 Irmantas Gailius because he had previously experienced
 harassment from this group in his days at the university. One
 letter, addressed to Albinas Gailius, states:
 Your son Irmantas protested against
 the Party and the people who worked for
 it. They have now been elected to
 positions of authority. For this reason
 your son must answer to us for all his
 past actions. We are suggesting that you
 think very seriously and without delay
 convince your son to appear before us. 
 Sooner or later, we will get him out of
 America. Do not force us to take drastic
 measures. Do not risk your life.
 
 Lithuanian Youth Forum
 There is evidence the Gailius family continued to
 experience other threats and harassment. In December 1992,
 Albinas Gailius, now unemployed, received a telephone call from
 the prosecutor who had him fired. The prosecutor asked Albinas
 if he had changed his mind about persuading Irmantas to return
 and whether he had enough problems. Soon afterwards, the
 Gailius family decided to leave Vilnius to escape further
 harassment. They went to stay with Irmantas Gailius'
 grandparents in Kaunas, Lithuania, a town outside the capital.
 On April 10 or 11, 1993, the Gailius apartment in
 Vilnius was again broken into and vandalized. At around that
 time, Gailius' sister Ingrida was accosted on the streets while
 in Vilnius by an unknown man. That man demanded to know why
 the Gailius family had not responded to the threatening
 letters, reminded Ingrida that she had children, and threatened
 her and the rest of the family with death unless Gailius
 returned to Lithuania.
 On August 9, 1993, the police came to Gailius'
 grandparents' house in Kaunas to inform Gailius' parents and
 sister that they could could not live there because they did
 not have residence permits for that address. One week later,
 Gailius' sister Ingrida received a threatening telephone call
 while visiting a friend in Vilnius; the caller told her to
 watch her children and that living in Kaunas would not protect
 them. Gailius' father Albinas looked for work abroad, hoping
 to move his family from Vilnius to escape the threatened
 reprisals. 
 II. On February 21, 1991, months before the expiration of
 his visitor's visa, Gailius filed an asylum application pro se,
 basing it on his fear of persecution because of his political
 views. Gailius' first asylum application was based on his fear
 of persecution from the Soviet military, which continued to
 occupy Lithuania, not from the civilian authorities, which at
 that time supported his views. From March 1990 until October
 1992, Sajudis held a majority in parliament and Landsbergis
 headed the government. Gailius did not allege that he feared
 any extra-governmental group. At the time he filed his first
 application, Gailius and his family had not yet experienced any
 personal threats. Gailius' primary fear at this time was that
 if he were to go back to Lithuania, "I would be arrested
 because I refused to go to [sic] the Soviet occupation army,"
 and also that he would continue to be associated with the
 volunteer Lithuanian independence army which was then
 considered illegal by the Soviet military.
 An Asylum Officer (AO) interviewed Gailius on August
 1, 1991. The AO referred Gailius' case to the State Department
 for an opinion on how the disintegration of the Soviet Union
 affected Gailius' asylum claims. In an opinion dated December
 4, 1991, the State Department responded: "The Soviet Union and
 the Soviet Army no longer have any authority within the
 territorial confines of Lithuania. We do not find any reason
 to believe that the applicant would be harassed or mistreated
 if he returned to his native country."
 In an opinion dated May 26, 1992, which Gailius says
 he did not receive, the AO explained that the INS intended to
 deny Gailius' request for political asylum. The opinion
 summarized the facts as Gailius had described them (including
 the July 1991 interrogation of his sister, but none of the
 threats that Gailius had experienced after that incident) and
 accepted that Gailius was telling the truth. The AO noted, "In
 your interview with the asylum officer you related the facts in
 a credible manner. There appears to be no reason to doubt that
 these incidents occurred in the way you described them." The
 AO nevertheless explained that the INS intended to deny Gailius
 asylum on the ground that "[t]he Government of the USSR has the
 right to require military service of its citizens, and to
 prosecute those who do not comply with its military service
 laws." Therefore, the AO reasoned, Gailius' fear of the draft
 could only support an asylum claim if the draft were used to
 punish him for his political views. Noting that Lithuania had
 become independent and enacted laws designed to protect against
 such persecution and that the Soviet army no longer had any
 authority in Lithuania, the AO regarded the risk of such
 punishment as minimal and stated that the INS intended to deny
 his asylum application. Gailius' new evidence of personal
 threats that had occurred after his asylum interview in August
 1991 was not considered as part of his first asylum
 application. 
 Gailius' asylum application was officially denied and
 he was served with an Order to Show Cause initiating
 deportation proceedings on the ground that his visitor's visa
 had expired. At a brief hearing on March 2, 1993, Gailius,
 through counsel, conceded deportability and renewed his
 application for asylum. Gailius submitted his second asylum
 application on April 30, 1993. In this application, Gailius
 claimed he would face serious harm, and possibly death, at the
 hands of a group of former Communists who had threatened him in
 retaliation for his political activities and which the
 government was unable or unwilling to control. In support of
 his claim, Gailius outlined the threats he and his family had
 faced since his first asylum application had been filed.
 The IJ again referred Gailius' case file to the State
 Department for an advisory opinion concerning then current
 country conditions in Lithuania. The record does not reveal
 precisely what evidence of threats was given to the State
 Department. In a June 7, 1993 opinion, the State Department
 responded that Gailius' claims were at odds with its views of
 country conditions, noting that "[t]he applicant . . .
 initially expressed concern over retribution for his efforts on
 behalf of Lithuanian independence, a goal lauded across the
 entire political spectrum in Lithuania, including by the
 communists." The State Department letter observed, "[s]ince
 his departure Lithuanian independence has been strengthened de
 facto as well as de jure." The State Department reasoned that
 Gailius would not be a target of persecution because, in its
 view, he was not a sufficiently prominent opponent of the
 former Communists to warrant their attention.
 The State Department opinion also questioned the
 authenticity of the order dismissing Gailius' father from the
 university. The letter said, "A rector, whatever his intent,
 would not have issued such a document couched in unveiled and
 personal terms." The State Department concluded that Gailius'
 "original concern about induction into the then Soviet army is
 totally bypassed by events." The letter stated that his
 account of specific threats of reprisal for his earlier
 political activities "does not comport with the national
 consensus and cannot be considered plausible." Finally, the
 letter concluded, "much in this case must devolve upon
 [Gailius'] credibility. On the basis of the written record, we
 must admit to being baffled and skeptical."
 The State Department opinion letter did not account
 for most of Gailius' specific evidence of threats of reprisals,
 and did not comment at all on the threatening letters which
 Gailius eventually placed into the record. It also made clear
 that the Department was operating from generalized information:
 These observations are based on our
 analysis of country conditions and other
 relevant factors, plus an evaluation of
 the specific information provided in the
 application. We do not have independent
 information about this applicant.
 Gailius was provided with a copy of the second State Department
 opinion to allow him to submit evidence to rebut it.
 A hearing was conducted before the IJ on January 26,
 1994, and continued on June 23, 1994 and December 22, 1994. 
 Gailius testified that he was "very scared" upon hearing of the
 threats and warnings contained in the letters, and the other
 incidents. In addition to the documentary evidence, Gailius
 submitted a sworn affidavit from his father Albinas. The
 affidavit confirms Gailius' account of the threats the Gailius
 family had received.
 On cross-examination, the INS attorney asked Gailius
 whether he still feared induction into the Soviet military, as
 he had stated in his first asylum application. Gailius claimed
 that he did, because he regarded the Lithuanian military, under
 the current government, as closely aligned with the Russian
 military. Gailius stated that he would have no objection to
 serving in a military which was truly independent from Moscow's
 influence. Gailius also claimed to fear the reincorporation of
 Lithuania into Russia, noting the popularity in Russia of
 ultra-nationalist politicians such as Vladimir Zhirinovsky.
 Gailius presented three other witnesses, primarily to
 rebut the State Department's opinion that changed country
 conditions in Lithuania had rendered Gailius' fears of
 persecution unfounded. The first witness, Rev. Albert Contons,
 the rector of St. Peter Lithuanian Church in South Boston, has
 been president of the Lithuanian Priests Legion for twenty
 years. Contons' parish is composed primarily of ethnic
 Lithuanians, and Contons speaks Lithuanian and travelled to
 Lithuania on several occasions in 1991, 1992 and 1993. He
 testified that the election of the former Communists to power
 in Lithuania in 1992 was the result of enormous economic
 pressure from Moscow. He also testified that many of the
 people involved in the Soviet regime were still occupying
 positions of authority in Lithuania, and that, under the
 current regime, Soviet-minded officers continue to dominate the
 military.
 Gailius' second witness was Professor Olimpiad Ioffe,
 a law professor at the University of Connecticut School of Law.
 In 1980, Professor Ioffe had been fired from his position as a
 law professor at Leningrad State University because he had
 supported his daughter's decision to emigrate to the West. The
 stated reason for his firing, like that of Gailius' father, was
 that he had failed to give his child a proper upbringing. 
 Ioffe's testimony was offered primarily to rebut the State
 Department's opinion questioning the authenticity of the order
 dismissing Albinas on grounds that a Soviet university official
 "would not have issued such a document couched in unveiled and
 personal terms." Professor Ioffe stated that, to the contrary,
 Soviet policy was to fire parents from their official positions
 if their children defied the Soviet authorities and that this
 policy was openly acknowledged in official documents.
 Gailius' final witness was an expert on the
 contemporary political situation in Lithuania, Lowry Wyman. 
 Wyman, a Russian area scholar and lawyer, had been a Fellow at
 the Russian Research Center at Harvard University since 1988. 
 Wyman had published numerous articles on legal reform in
 Lithuania and other former Soviet republics. At the time of
 her testimony in 1994, Wyman was working on a contract with the
 United States Agency for International Development (USAID) on
 a project for strengthening the rule of law in the newly
 independent nations of Central Asia. Wyman had worked in
 Lithuania for several months in late 1990 and early 1991
 directly for then President Landsbergis, the leader of the
 Sajudis movement, and witnessed first-hand the Soviet Union's
 attempt to depose President Landsbergis' government. She and
 her husband had also drafted, at the request of President
 Landsbergis, a model constitution for an independent Lithuania. 
 Wyman testified that she maintained close contact with former
 colleagues and scholars in Lithuania and followed events in
 Lithuania closely.
 When questioned about current conditions in
 Lithuania, Wyman testified that the former Communists had
 engaged in "reprisal and intimidation" of those who backed the
 Lithuanian independence movement. In Wyman's opinion, assuming
 the threats to which Gailius testified had occurred, Gailus'
 fears of intimidation, imprisonment and possible death if
 forced to return to Lithuania were entirely plausible. She
 testified that the State Department's account of conditions in
 Lithuania under the former Communists, now elected to power,
 "represented . . . wishful thinking" rather than "the actual
 conditions of the country." Wyman testified that the
 authorities in Lithuania have not come to respect ordinary
 citizens' right to dissent from the prevailing government. She
 added that, despite the existence of constitutional protections
 in theory, ordinary officials did not respect these rights in
 practice, particularly now that the former Communists had
 regained power through electoral means. She rejected the State
 Department's opinion that Gailius would be unlikely to face
 such reprisals because he was insufficiently prominent. She
 noted that, on the contrary, ordinary citizens who dissented
 from the official view, not just prominent leaders, were often
 the targets of official harassment by the authorities. Wyman
 testified that the threats Gailius had outlined were,
 unfortunately, still "quite typical" in Lithuanian political
 culture, despite the formal abandonment of the Soviet system.
 On December 22, 1994, the IJ determined that Gailius
 was not eligible for asylum. The IJ relied heavily on the
 State Department's second advisory opinion. She determined
 that, while Gailius was "an earnest young man," his claimed
 fears were not well founded. As to the threatening letters,
 the IJ expressed some skepticism in that the threats had
 appeared after the denial of Gailius' first asylum claim. 
 Nevertheless, she did not make any finding concerning their
 authenticity; instead, she found these letters to be
 insufficient to support Gailius' asylum claim because the
 author was unknown and the threats could have been from a
 person or group with a "personal vendetta" against the family. 
 The IJ also stated that she regarded Gailius' fears as
 exaggerated, "at times leading to . . . paranoia," and that,
 while he had been active in the protests against Soviet rule,
 he overstated his importance in the Lithuanian independence
 movement.
 On October 9, 1997, the BIA affirmed the IJ's
 decision "for the reasons set forth in the Immigration Judge's
 decision." The BIA rejected Gailius' challenge to the IJ's
 assessment of his testimony, and to the IJ's reliance on the
 State Department's second advisory opinion.
 Gailius filed a timely petition for review in this
 court. Because Gailius challenges a deportation order made
 final after October 31, 1996 in a case initiated prior to April
 1, 1997, Gailius' case is governed by the "transitional rules"
 for judicial review established by the Illegal Immigration
 Reform and Immigrant Responsibility Act of 1996, Pub. L. No.
 104-208, Div. C, 309, 110 Stat. 3009-546, 3009-625 to 627. 
 Therefore, this court has jurisdiction pursuant to former 106
 of the Immigration and Nationality Act (INA). See Meguenine v.
 INS, 139 F.3d 25, 26 (1st Cir. 1998).
 III.
 We review the BIA's determination that Gailius was
 ineligible for asylum and withholding of deportation "to
 determine if it is supported by 'substantial evidence.'" Id.at 27 (quoting Ipina v. INS, 868 F.2d 511, 513 (1st Cir.
 1989)). We review the BIA's legal conclusions de novo, with
 appropriate deference to the agency's interpretation of the
 underlying statute in accordance with administrative law
 principles. See id. 
 To establish a "well-founded fear of persecution,"
 Gailius must establish that his claimed fear is genuine and
 that it is objectively reasonable. See INS v. Cardoza-Fonseca,
 480 U.S. 421, 430-31 (1987); Cordero-Trejo v. INS, 40 F.3d 482,
 491 (1st Cir. 1994). Because both determinations depend
 heavily on the credibility of the applicant and the applicant's
 evidence, we have emphasized the need for clarity from the BIA
 in assessing an asylum claimant's testimony. See Cordero-
 Trejo, 40 F.3d at 491-92; see also Aguilera-Cota v. INS, 914
 F.2d 1375, 1381 (9th Cir. 1990) (requiring a "rational and
 supportable connection between the reasons cited and the
 conclusion that the petitioner is not credible" in order to
 facilitate review of the agency's determinations).
 The need for clear administrative findings is
 implicit in the statute under which we review the BIA's
 decision. The statute requires that the agency's conclusions
 be "supported by reasonable, substantial, and probative
 evidence on the record considered as a whole . . . ." Old INA
 106(a)(4), 8 U.S.C. 1105a(a)(4); see Fergiste, 138 F.3d at
 17 (citing cases). Although our review is "deferential,"
 Meguenine, 139 F.3d at 27, we have rejected the notion that the
 INS is "a unique kind of administrative agency entitled to
 extreme deference." Cordero-Trejo, 40 F.3d at 487 (internal
 quotation marks and citation omitted). Rather, we apply
 "normal principles of administrative law governing the role of
 courts of appeals when reviewing agency decisions for
 substantial evidence . . . ." Id.
 Under those principles, "a reviewing court . . . must
 judge the propriety of [administrative] action solely by the
 grounds invoked by the agency," and "that basis must be set
 forth with such clarity as to be understandable." SEC v.
 Chenery Corp., 332 U.S. 194, 196 (1947); see generally I K.
 Davis & R. Pierce, Administrative Law Treatise, 8.5 (3d ed.
 1994) (explaining when agency must make findings and provide
 reasons for its decisions). "[T]he agency's decision cannot be
 supported on reasoning that the agency has not yet adopted." 
 Puerto Rico Sun Oil Co. v. EPA, 8 F.3d 73, 79 (1st Cir. 1993)
 (citing Chenery, 332 U.S. at 196). No finding regarding the
 letters' authenticity was made by the agency, and it is for the
 agency, not the courts, to make findings of fact. Thus, the
 INS may not seek to have the BIA opinion upheld on the grounds
 that there was no reasonable fear of persecution because the
 letters were not authentic; the agency simply has not ruled on
 the authenticity issue, either implicitly or explicitly.
 Nor may we simply ignore the evidence of the
 threatening letters, and examine only the evidence that
 supports the BIA's determination. The statute admonishes us to
 conduct our review on the whole record, and we may not affirm
 the BIA's decision "when [we] cannot conscientiously find that
 the evidence supporting that decision is substantial, when
 viewed in the light that the record in its entirety furnishes,
 including the body of evidence opposed to the Board's view." 
 Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); see
 also Cordero-Trejo, 40 F.3d at 487 (applying Universal Camerastandard to review of BIA decision). Instead, we must review
 the BIA's decision to determine if -- despite the failure to
 make specific findings concerning the threats -- the agency
 articulated other adequate reasons for denying Gailius' asylum
 claim. We examine each reason in turn, and find each
 deficient.
 The IJ concluded that, even if these threats had
 occurred as Gailius described them, a matter on which she did
 not rule, Gailius was nevertheless ineligible for asylum
 because "a reasonable person in his situation would [not]
 necessarily have the same fear." We disagree. Gailius offered
 specific testimony outlining a series of very serious threats 
 and corroborated that testimony with documents. If the threats
 are real, and in the absence of some adequate reason to the
 contrary, Gailius may well have had a well-founded fear that he
 would suffer serious harm at the hands of the former Communists
 in retaliation for his political activities and opinions.
 In Matter of Mogharrabi, 19 I. & N. Dec. 439 (BIA
 1987), the BIA outlined a four-part test for determining
 whether an applicant has established a well-founded fear. 
 Under that test, an applicant must present evidence that
 establishes that (1) he or she possesses a belief or
 characteristic that a persecutor seeks to overcome in others
 through some form of punishment, (2) that the persecutor is
 aware, or could become aware, that the applicant possesses this
 belief or characteristic, (3) that the persecutor has the
 capability of punishing the applicant, and (4) that the
 persecutor has the inclination to punish the applicant. Seeid. at 446-47 (citation omitted). Gailius presented ample
 evidence, if accepted as credible, of specific facts that
 satisfies all four elements of the Mogharrabi test.
 The IJ noted that, even if the threats had occurred,
 it was not apparent who was making the threats and how many
 people were behind the threats. The agency's opinion may not
 be upheld on that ground. We have rejected any requirement
 that asylum applicants identify their persecutors when their
 fear is of clandestine groups. See Cordero-Trejo, 40 F.3d at
 488 (applicant's failure to identify "unknown armed men" or
 "death squads" who threatened him was not a reasonable basis
 for doubting his credibility). Persecutors "have [not] been
 given adequate notice that our government expects them to sign
 their names and reveal their individual identities when they
 deliver threatening messages." Aguilera-Cota, 914 F.2d at
 1380. The fact that the person or persons who authored the
 threatening letters is not specifically identified does not
 excuse the agency's failure to specifically rule on their
 genuineness. In any event, the record shows that many of the
 threatening messages were signed "Lithuanian Youth Forum," the
 successor to the Communist Party's youth wing, an organization
 with which Gailius had fought in his days at the university.
 The IJ also concluded that Gailius' testimony was at
 odds with country conditions as described in the State
 Department opinions. Of course, asylum applicants are entitled
 to respond to claims of changed country conditions. SeeGebremichael v. INS, 10 F.3d 28, 39 (1st Cir. 1993). Given the
 evidence Gailius produced, the State Department's view of
 country conditions alone does not provide a "rational and
 supportable connection between the reasons cited and the
 conclusion that the petitioner is not credible." Aguilera-
 Cota, 914 F.2d at 1381. Unlike the vast majority of asylum
 claimants, Gailius managed to provide corroboration for his
 account of these threats and the harassment to his family by
 offering the threatening letters themselves into evidence,
 complete with certified translations, as well as his father's
 sworn testimony.
 Such corroborative evidence is not required to
 establish an asylum claim; in many cases, the applicant's own
 credible testimony is sufficient to support eligibility for
 asylum as long as it provides a basis for a well founded fear. 
 See 8 C.F.R. 208.13(a) (1997); Cordero-Trejo, 40 F.3d at 491. 
 This is because "refugees rarely are able to offer direct
 corroboration of specific threats or specific incidents of
 persecution." Turcios v. INS, 821 F.2d 1396, 1402 (9th Cir.
 1987) (citation omitted). Therefore, in most asylum cases, the
 credibility of the applicant's uncorroborated testimony is the
 central issue. In determining credibility, the regulations
 contemplate weighing the applicant's account of specific
 incidents "in light of general conditions in the applicant's
 country of nationality or last habitual residence" to determine
 if the applicant's testimony is plausible. 8 C.F.R. 
 208.13(a) (1997); see Cordero-Trejo, 40 F.3d at 491. 
 In Gailius' case, however, there is a crucial
 difference; his testimony did appear to be corroborated by
 specific documentary evidence, including the threatening
 letters. It was also corroborated by the affidavit of his
 father. Therefore, to reject Gailius' testimony, the IJ must
 do more than point to general conditions in Lithuania. 
 Instead, the IJ must also determine that the other evidence
 Gailius produced in corroboration of his testimony is not
 genuine, or, for some other adequate reason, not persuasive. 
 The agency essentially ignores this evidence. Cf. id. at 487
 (BIA decision is "not supported by substantial evidence because
 it ignores significant documentary evidence pertinent . . . to
 the credibility of [the applicant's] claimed fear of
 persecution"). The agency's reasoning -- that Gailius was
 insufficiently prominent to have received threats -- is
 inadequate. Cf. id. at 491 (finding that agency's reasons for
 doubting applicant's credibility were inadequate and
 "unreasonably eviscerate [applicant's] attempt to establish
 both the objective and the subjective elements of his asylum
 claim"). The BIA's suggestion that Gailius was not
 sufficiently prominent to have a plausible fear of persecution
 presupposes that the threatening letters he introduced were not
 genuine -- a conclusion that the IJ declined to reach.
 In rejecting Gailius' asylum claim, the IJ placed
 heavy reliance on the State Department's second advisory
 opinion. Given the evidence Gailius produced, that alone does
 not excuse the agency's failure to rule on the threats. Even
 as to general country conditions, "[t]he advice of the State
 Department is not binding, either on the service or on the
 courts . . . ." Gramatikov v. INS, 128 F.3d 619, 620 (7th Cir.
 1997); cf. Gebremichael, 10 F.3d at 39 (holding that asylum
 applicants must be given an opportunity to rebut the State
 Department's view of country conditions). This is both because
 it is the Attorney General, not the Secretary of State, whom
 Congress has entrusted with the authority to grant asylum and
 because "there is perennial concern that the [State] Department
 softpedals human rights violations by countries that the United
 States wants to have good relations with." Gramatikov, 128
 F.3d at 620.
 While the documentary evidence alone, if genuine,
 could well cause us to question the conclusion that there is no
 well-founded fear of persecution, Gailius presented more.
 Gailius produced the testimony of Lowry Wyman, an expert
 witness. The IJ acknowledged that her knowledge of Lithuania
 and the situation in the former Soviet republics in general is
 quite impressive. State Department opinions receive
 considerable weight in the courts because of the State
 Department's expertise. Gailius' expert also possessed a high
 degree of expertise, including both academic credentials and
 practical direct experience working in post-independence
 Lithuania for President Landsbergis and elsewhere in the former
 Soviet Union for USAID. This gives additional emphasis to why
 the agency may not jump over the issue of the threats. 
 Finally, both the State Department opinion and the IJ
 commented that Gailius' new evidence of threats to his family
 surfaced only after the initial denial of his asylum claim. To
 rely on this timing alone as a basis for ignoring Gailius'
 testimony and other evidence is a non sequitur. Such reasoning
 ignores the fact that the threats largely appeared beginning in
 1992, at about the time the former Communists regained power
 through electoral means. This is not a case where an applicant
 for asylum materially changes his story by adding testimony
 that he could have provided earlier, thus casting doubt on its
 veracity. Gailius' account of the threats is entirely
 consistent with his earlier claim for asylum based on his
 political activities in 1989 and 1990 and his fear of
 punishment for resisting the draft. Just as the INS may rely
 on changes in country conditions to rebut an asylum claim, an
 asylum applicant may submit evidence of new threats to his
 safety that occur after applying for asylum and which support
 his fears of persecution.
 "In order for this court to conduct a proper
 substantial evidence review of the BIA's decision, the Board's
 opinion must state with sufficient particularity and clarity
 the reasons for denial of asylum." Hartooni v. INS, 21 F.3d
 336, 343 (9th Cir. 1994) (internal quotation marks and citation
 omitted). For this court to review BIA decisions, the agency
 must adequately explain why it does not find the evidence of
 threats credible or persuasive and the relevant documents
 authentic when that evidence goes to the heart of whether there
 is a fear of future persecution. While the burden is on the
 applicant to establish that he or she is eligible for asylum,
 if the applicant produces testimony showing a pattern of
 specific threats giving rise to a well-founded fear of
 persecution, the IJ must, if he or she chooses to reject that
 testimony as lacking credibility, offer a "specific, cogent
 reason for [the IJ's] disbelief." Turcios, 821 F.2d at 1399
 (citations and internal quotation marks omitted); see also II
 Davis, supra, 11.2, at 189-90 (noting that an agency must
 provide reasons for its disbelief of uncontradicted testimony
 to facilitate judicial review). This is particularly so in the
 rare case when an asylum applicant is able to produce
 corroboration for his or her testimony. 
 Because "[b]oth the [IJ] and the Board failed to
 address much of [Gailius'] evidence," Cordero-Trejo, 40 F.3d
 at 492, and because the IJ did not make a determination of the
 credibility and authenticity of Gailius' evidence of threats,
 we remand for further consideration. This is the appropriate
 remedy when a reviewing court cannot sustain the agency's
 decision because it has failed to offer legally sufficient
 reasons for its decision. See Pension Benefit Guar. Corp. v.
 LTV Corp., 496 U.S. 633, 654 (1990) (noting that, in this
 situation, "remanding to the agency is . . . the preferred
 course" (citation omitted)); Osorio v. INS, 99 F.3d 928, 932-33
 (9th Cir. 1996) (remanding to address an insufficiently
 reasoned credibility determination against the applicant);
 Brown v. HHS, 46 F.3d 102, 115 (1st Cir. 1995); Cordero-Trejo,
 40 F.3d at 492. "At the same time, in all fairness, we apprise
 the Board that we have grave doubts whether a reasonable fact-
 finder making the full study this record calls for could deny
 refugee status to [Gailius]." Cordero-Trejo, 40 F.3d at 492. 
 Whether Gailius ultimately should be granted asylum is, of
 course, a matter for the agency's discretion. 
 The order of the BIA is vacated, and the case is
 remanded to the BIA for further proceedings consistent with
 this opinion.